BRIAN MICHAELS, OSB #925607
259 East Fifth Avenue, Suite 300-D
Eugene, Oregon 97401
Telephone: (541) 687-0578
Fax:        (541) 686-2137
brian@brianmichaelslaw.com

MARIANNE DUGAN, OSB # 932563
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
Telephone:  (541) 338-7072
Fax:        (866) 650-5213
mdugan@mdugan.com

      Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| JOANN ALLEN ERNST; JAMIE ALLEN; JOANNA ALLEN; and JACK ALLEN,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF EUGENE, a municipality; OFFICER JOE KIDD; and OFFICER MATT LOWEN, in their individual capacities and as police officials for the City of Eugene,<br><br>    Defendants. | No. 6:10-cv-10-6245-AA<br><br>PLAINTIFFS' RESPONSE TO DEFENDANT BILLS' MOTION FOR SUMMARY JUDGMENT<br>**[CORRECTED TO ADD HEADER]**<br>ORAL ARGUMENT REQUESTED |

    Plaintiffs submit this response to defendant Jennifer Bills' Motion for Summary

Judgment.

**I.    INTRODUCTION**

    This case is about a family, asleep in the pre-dawn hours in August 2009, woken with

sounds of bombs, breaking windows, shattering glass, the insertion of at least one bomb-like

PAGE 1 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

device into a bedroom where they lie sleeping, their home filling with the presence of dark-clad, heavily armed, military-dressed SWAT teams, shouting commands and threatening violence. Their home and their spirits were damaged as in a military battle – all without any probable cause to believe any danger was present in this home. Indeed, all alleged facts indicating danger were either unreliable (*e.g.* an arrest, but no conviction, for carrying a knife), or known to be false (a gunshot wound falsely alleged to be associated with this home and one of its residents).

Unbeknownst to plaintiffs until her deposition in October 2011, Lieutenant Jennifer Bills was the ultimate decider and buck-stopper, as she was obligated to investigate these facts and authorize the use of a SWAT team. Her failure to properly investigate the officers' allegations wreaked havoc on the plaintiffs akin to a war zone.

Lt Bills introduces her Memorandum with a series of unsupported and irrelevant facts describing – in classic "yellow journalism" style – an alleged heroin epidemic in the summer of 2009, and declaring histrionically and falsely that plaintiffs' home was part of this epidemic. Plaintiffs' home was singled out only by unreliable heroin dealers, who were known to the EPD officers as having lied to them about both this home, and about its resident, Jack Allen. When Officer Joe Kidd "identified Jack Allen" as a part of his investigation inside this alleged "epidemic," it was only via the identification by known heroin dealers and users who falsely blamed Jack Allen for a gunshot wound.

Had Lt Bills simply looked at the Officer Lowen's police report that was generated as a result of the gunshot incident, she would have quickly discovered that officer Lowen (the investigating officer) did not believe that Jack Allen or his home was actually involved with the gunshot wound. Instead, Lowen concluded that the two heroin users and dealers were lying to

PAGE 2 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

him and that the gunshot wound was self-inflicted. Defendants' persistence in repeating this false tale told by a junkie signifies nothing, and deserves none of the sound and fury defendants apparently intended to elicit from the reader. Even assuming the alleged "heroin epidemic" was true, defendants used that situation improperly to justify roughshod tactics, lassoing in innocents. The plaintiffs became actors in the defendants' play – in the words of Shakespeare in MacBeth, "but a walking shadow, a poor player, that struts and frets his hour upon the stage" – and then should have been "heard no more."

## II.    FACTS

Lieutenant Bills is and was supervisor of the SWAT unit, and as such she reviewed the SWAT Affidavits for Search Warrant, and was involved as the ultimate decider in the relevant SWAT incursions and investigations. Michaels Decl. Ex. 1 (Bills Depo.) at 17:21 to 18:23; id. at 22:22 to 23:1; id. at 61:16 to 62:14; id. at 84:14-21.

Lt Bills reviewed the Affidavit for Search Warrant and the Risk Matrix regarding plaintiffs' home, as prepared by Officer Kidd. She also reviewed the operation plan as written by Officer Lowen. Michaels Decl. Ex. 1 (Bills Depo.) at 133:24 to 135:22.

At the crux of the Affidavit for Search Warrant (and of Kidd's investigation), was the false premise that Jack Allen (a resident of plaintiffs' home), as well as plaintiffs' home itself, were involved in a gunshot wound incident. The investigating officer of that gunshot incident, Officer Lowen, properly concluded the individuals accusing Mr. Allen and identifying Buck Street were lying. These individuals were the same ones identified by defendants in their Motions for Summary Judgment as being involved with Jack Allen – specifically, Mr. Jurrens and Mr. Kneece. Michaels Decl. Ex. 3 (Lowen Depo.) at 97:1 to 100:22; Michaels Decl. Ex. 2

(Kidd Depo.) at 152:25 to 153:6.

In Officer Lowen's operations plan, he did not identify either individual as potentially being present at the Buck Street home. Michaels Decl. Ex. 6 (Tactical Operation Report prepared by Lowen) at 7.

As explained herein, only upon deposition of Lt Bills did plaintiffs learn of her hands-on involvement in the decisions and investigations leading up to the nighttime incursion using SWAT force on their home.

The so-called "Risk Matrix" prepared by Kidd and reviewed with approval by Bills does nothing to numerically evaluate, in an objective framework, the risk (if any) presented by this home. Michaels Decl. Ex. 1 (Bills Depo.) at 99:3 to 25; Michaels Decl. Ex. 4 (Solesbee Depo.) at 52:10-57:25.

Lt. Bills did nothing to ensure that the investigation was internally consistent, truthful, and achieved the right conclusion for use of SWAT force incursion. Lt Bills is responsible for approving the continued use of a so-called "Risk Matrix" form which offers no intrinsic value, but rather may be manipulated by the officer to achieve use of SWAT force under almost any circumstance. Michaels Decl. Ex. 1 (Bills Depo.) at 20:12 to 21:12; id. at 133:24 to 135:22; id. at 42:13-:22.

### III.    STANDARD FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if the movant demonstrates there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Oregon Natural Resources Council v. Marsh, 845 F. Supp. 758, 764 (D. Or. 1994). Whether the evidence is such that a reasonable jury could return a verdict for the

nonmoving party determines the authenticity of a dispute. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

All reasonable doubts as to the existence of genuine issues of material fact must be resolved against the moving party, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.</u>, 809 F.2d 626, 630 (9th Cir. 1987).

Summary judgment on statute of limitations, when the "discovery" rule is invoked, is rarely allowed. That is because "[p]recisely when a person reasonably should have known that the harm suffered was caused by another's negligence generally presents a question of fact." <u>Hoeck v. Schwabe, Williamson & Wyatt</u>, 149 Or App 607, 945 P2d 534 (1997). See also <u>Robertson v. Jessup</u>, 117 Or App 460, 465, 845 P2d 926 (1992) (same).

## IV.  SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS IS NOT WARRANTED

### A.  The Law of the Case Precludes Defendant from Rearguing This Issue

The issue of statute of limitations with regards to Lieutenant Bills was already fully briefed, and this court already allowed plaintiffs to amend their complaint to add Lt Bills, over defendants' objection.

Under the doctrine of the law of the case, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>Christianson v. Colt Ind. Operating Corp.</u>, 486 U.S. 800, 816 (1988) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983)).

> The "law of the case" rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case . . . unless the evidence on a subsequent trial was substantially different, controlling authority

has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

Pit River Home and Agricultural Coop. v. United States, 30 F.3d 1088, 1096-97 (9th Cir. 1994) (quotations omitted).  None of those three situations applies in the instant case.

This Court decided months ago the legal issue regarding whether plaintiffs' claims against Lt Bills are barred by the statute of limitations.  Thus, Ninth Circuit law dictates that this Court may not reconsider its previous ruling (in the absence of one of the three situations listed above).

> **B.   Even If Law of the Case Does Not Apply, There Are Material Issues of Fact Which Preclude Summary Judgment on the Statute of Limitations**
>
> > **1.   Plaintiffs Did Not (and Could Not, Reasonably) Learn of Lt Bills' Role as Final Approver of SWAT, until October 2011**

It was not until plaintiffs took Bills' deposition in October 2011, that they learned what role she played in utilizing SWAT at plaintiffs' home.  As explained in the Declaration of Brian Michaels at 2-3, when plaintiffs asked defendant in Interrogatory No. 2 who reviewed the Affidavit for Search Warrant by Officer Kidd that informed the Magistrate that SWAT would be used to serve the search warrant, defendants refused to answer the question.  This was defendants' response:

> **INTERROGATORY NO.2:**  Please provide the name of each Eugene Police Department person who reviewed Officer Joe Kidd's Affidavit for Search Warrant, or discussed with Officer Joe Kidd about his Affidavit for Search Warrant, presented to Judge Mitchell for 1295 Buck Street.  Please include the content of any discussions or review - what was said by whom.
>
> **Response**: Defendants object to this interrogatory on the ground that it is vague and ambiguous in that it does not define the terms "Eugene Police Department person," "reviewed," or "discussed with Officer Joe Kidd about."  Defendants further object to this request on the ground that it does not relate to any matter that may be inquired into under Fed. R. Civ. P. 26(b) because it seeks information which is not relevant to any viable

PAGE 6 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

claim or defense in this case, or reasonably calculated to lead to the discovery of admissible evidence, and therefore seeks information which is beyond the scope of discovery under Fed. R. Civ. P. 26(b). Plaintiffs' claims regarding the validity of Officer Kidd's affidavit and the resulting search warrant are barred under the doctrine of Heck v. Humphrey. By agreement of the parties, defendants will not answer this interrogatory, unless or until, defendants' pending Motion for Partial Summary Judgment is denied.

As explained in the Declaration of Brian Michaels, as early as April 26, 2011, plaintiffs attempted to obtain this discovery, writing the following to defense counsel:

> With respect to the discovery we are seeking from defendants to which you state continuing objections below and in your emails of 4/22/11, we must disagree as to your interpretation of how the holding in Simpson v. Thompson applies to our case. The 9th Circuit Court in Simpson [in the paragraph just before the conclusion therein] very clearly stated that the district court had erred when it excluded, based on Heck, testimony that the officer defendant therein had initiated the physical altercation:
>
> > [W]e hold that Heck is not an evidentiary doctrine. Therefore, we reverse and remand for a new trial. We conclude that even if the district court determines on remand that Simpson may not file a section 1983 lawsuit relating to any injuries stemming from Thomas's alleged punch upon entering the cell, Simpson is still entitled to tell the jury the entire story – in other words, he may present evidence and/or testimony that Thomas initiated the physical confrontation in the cell by punching Simpson. (emphasis added).
>
> Plaintiffs in our case are similarly entitled to present the entire story to the jury and Heck v. Humphrey does not in any way preclude plaintiffs from pursuing the discovery requested. Defendants may not refuse to produce this discovery based on the doctrine of Heck v. Humphrey. Plaintiffs are entitled to receive production of this discovery and renew their requests that defendants comply with these requests as soon as possible.

Michaels Decl. at 3-4.

Not until plaintiffs deposed Lt Bills did plaintiffs learn of her role in approving the Search Warrant Affidavit and the (apparently inevitable) use of SWAT to serve the search warrant. Michaels Decl. Ex. 1 (Bills Depo.) at 17:21-25. As supervisor, Lt Bills testified she typically reviews Affidavits for Search Warrant involving SWAT, and typically interviews with the investigating officer who is usually the affiant for search warrant. Id. at 61:16 to 62:14;

PAGE 7 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

84:14-21. Plaintiffs also learned that Lt Bills "presumes" she consulted with Officer Kidd when he wrote into his Affidavit For Search Warrant that SWAT would be serving the search warrant. Michaels Decl. Ex. 1 (Bills Depo.) at 143:19 to 144:3. It was then (at the October 2011 depositions) that plaintiffs learned that it was Lt Bills who screened and provided final approval for the use of SWAT at plaintiffs' home.

### 2. Lt. Bills Had Notice of the Potential for a Claim Against Her Within the Statute of Limitations

In addition, given the supervisory role Lt Bills played in approving, investigating, interviewing, and directing all SWAT activations, Lt Bills had sufficient notice she could become a named defendant in plaintiffs' Complaint alleging among other injuries the use of military type activities through SWAT. Even if the discovery rule does not apply (briefed immediately *supra*), this satisfies the notice prong identified by the Supreme Court in Krupski v. Costa Crociere S. p. A.:

> Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading "relates back" to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations. Where an amended pleading changes a party or a party's name, the Rule requires, among other things, that "the party to be brought in by amendment . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Rule 15(c)(1)(C). In this case, the Court of Appeals held that Rule 15(c) was not satisfied because the plaintiff knew or should have known of the proper defendant before filing her original complaint. The court also held that relation back was not appropriate because the plaintiff had unduly delayed in seeking to amend. **We hold that relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading**. Accordingly, we reverse the judgment of the Court of Appeals.

130 S. Ct. 2485, 2489-90 (2010) (emph. added.) The Court further elucidated the subject:

> **Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the**

>    **proper party's identity.  For purposes of that inquiry, it would be error to conflate knowledge of a party's existence with the absence of mistake**. . . . That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity.  A plaintiff may know that a prospective defendant – call him party A – exists, while erroneously believing him to have the status of party B.  Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim.  If the plaintiff sues party B instead of party A under these circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties.  **The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.**

Id. at 2493-94 (emph. added).

V.      **LIEUTENANT BILLS IS NOT ENTITLED TO QUALIFIED IMMUNITY**

Recently, in Bravo v. City of Santa Maria, the Ninth Circuit made clear that excessive force is necessarily implicated by utilizing SWAT and nighttime service of search warrants:

>    **A nighttime incursion by a SWAT force is a far more serious occurrence than an ordinary daytime intrusion pursuant to a regular warrant and therefore requires higher justification beyond mere probable cause to search.  See United States v. Colonna, 360 F.3d 1169, 1176 (10th Cir. 2004)** ("[T]he mere likelihood that drugs or weapons will be found at a particular premises does not justify a no-knock or nighttime execution of a search warrant.").  **Were this not the case, then any showing of probable cause to search would justify nighttime intrusion by a team of SWAT officers.**  The Supreme Court has held clearly that a no-knock entry is justified only by "exigent circumstances," which include when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  Richards v. Wisconsin, 520 U.S. 385, 394 (1997).
>
>    We see no reason not to apply the same standard to SWAT officers' nighttime searches, which both constitute much greater intrusions on one's privacy than ordinary day time searches and carry a much higher risk of injury to persons and property.  See Alexander v. City & Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) (explaining that a jury might conclude that deployment of a SWAT team for the purpose of inspecting property was excessive); Estate of Smith v. Marasco, 430 F.3d 140, 149 (3d Cir. 2005) (**"[A] decision to employ a SWAT-type team can constitute excessive force if it is not objectively reasonable to do so in light of the totality of the circumstances**." (internal quotation marks omitted)); Holland ex rel. Overdorff v.

PAGE 9 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

> Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001) **("[T]he decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests.");** Rush v. Mansfield, 771 F. Supp. 2d 827, 858-59 (N.D. Ohio 2011); Solis v. City of Columbus, 319 F. Supp. 2d 797, 808-09 (S.D. Ohio 2004).

665 F.3d 1076,1085-86 (9th Cir. 2011) (emph. added).

Following on this concept, the Ninth Circuit reminded us all of the responsibilities inherent in each officer responsible for SWAT activation in Motley v. Parks,:

> It is incumbent on the officer[s] executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." Groh [v. Ramirez], [540 U.S. 551,] 124 S. Ct. [1284] at 1293 [(2004)]. The Groh Court emphasized that unless there are exigent circumstances, officers are required to carefully ensure that constitutional requirements are met when searching a person's residence, and are not entitled to qualified immunity when they do not. Id. at 1294 n. 9. The same care, if not more, must be taken when the officers are searching without a warrant, under an exception to the warrant requirement.
>
> **The searching officers' responsibilities include a duty to conduct a reasonable investigation: "Although a police officer is entitled to rely on information obtained from fellow law enforcement officers, . . . this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts."** Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1293 n. 16 (9th Cir. 1999) (citation omitted); *cf.* United States v. Kyllo, 37 F.3d 526, 529 (9th Cir. 1994) ("Furthermore, the fact that [the officer] relied on information received from another law enforcement officer does not ipso facto mean that [he was] not reckless."); Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir. 1991) (noting that in some circumstances, officers have a duty to investigate further when they obtain additional information at the scene of a crime); Merriman v. Walton, 856 F.2d 1333, 1335 (9th Cir. 1988) (holding that even though an initial report that a suspect had committed a kidnapping might have established probable cause, the officer received exculpatory information before arresting the suspect, and a reasonable officer would have investigated further before making the arrest).

383 F.3d 1058, 1069 (9th Cir. 2004) (emph. added).

Consistent with Motley and Bravo, Lt Bills as supervisor and decider of SWAT activation had responsibilities to ensure the use of SWAT was proper, constitutional and reasonable, and was thereby on notice she would become a defendant in this action charging

SWAT as excessive use of force. Accordingly, she was necessarily obligated to ensure sufficient independent investigation of the underlying facts for use of SWAT. Lt Bills failed even to properly investigate the allegations of the sole gunshot allegation against the only resident of the Buck Street home. In her deposition, Bills described her involvement in the investigation:

> Q. Do you conclude from reading that report that Mr. Jack Allen was not interviewed or considered a suspect in the crime?
>
> A. I do. He's not a suspect but he is involved somehow.
>
> Q. How is he involved?
>
> A. He is mentioned by Mr. Kneece as having been involved with an injury somehow that occurred to Mr. Jurrens.
>
> Q. And did you not read in that report that Mr. Lowen, the investigating officer, did not believe him?
>
> A. Yes.
>
> Q. Okay. So how do you --
>
> A. Yes. There's some doubt that he is involved but only by mention by one of the people who was also involved in it.
>
> * * *
>
> Q. This is [Ex.] 107. It's Mr. Lowen's affidavit of the same incident. And when you're finished, let me know. (Pause.)
>
> A. Okay.
>
> Q. Have you reviewed this probable cause affidavit before, 107?
>
> A. I don't recall this, no. I may have but I don't recall it. I do recall the report.
>
> Q. Do you see from the affidavit of probable cause that Mr. Allen is not even mentioned?
>
> A. Correct. He's not in here.
>
> Q. Okay. Now, would you agree that Mr. -- Officer or Sergeant Lowen believed Mr.

PAGE 11 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

> Allen was involved in a gun shooting, that he would further investigate and attempt to interview Mr. Allen in regards to that firearm?
>
> MR. MILLER: Objection, calls for speculation. Objection, argumentative.
>
> A. It's difficult to speculate exactly what he would do.
>
> Q. Uh-huh. But?
>
> A. If he believes someone was a suspect, that he would investigate it.
>
> Q. Any good officer would?
>
> A. I would hope.

Michaels Decl. Ex. 1 at 133:24 to 135:22.

Lt Bills was responsible for reviewing (and per Bravo and Motley, for investigating), the use of the so-called "Risk Matrix" assessment to determine whether to utilize SWAT at plaintiffs' home. Michaels Decl. Ex. 1 (Bills Depo.) at 17:21 to 18:23; id. at 22:22 to 23:1. Lt Bills does not know where or by whom the "Matrix" values and criteria were developed, nor of any guidelines in its use. Id. at 20:12 to 21:12; id. at 42:13-:22. The Matrix is so vague as to allow any officer to justify the use of SWAT at any location. For example, Lt Bills acknowledged that the Matrix allows the officer to take into account arrests, without convictions being necessary; and that facts that are "unknown" receive one point each:

> Q. Okay. So he gets 8 points for a knife he was never convicted of and 2 points for a sale or manufacture for sale of controlled substance that he has never been convicted of. Is that correct?
>
> MR. MILLER: Objection, argumentative. Misstates the facts in evidence.
>
> BY MR. MICHAELS:
>
> Q. Okay. Is that correct?
>
> MR. MILLER: Same objection.

PAGE 12 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

BY MR. MICHAELS: Q. Okay. Fine. Is that correct?

MR. MILLER: Same objection.

A. The question's inaccurate. I don't know if he was convicted or not for those crimes.

BY MR. MICHAELS:

Q. Okay. So more properly asked, then, it doesn't matter whether or not he was convicted of those crimes in order for him to get the numerical value on the matrix that he received. Isn't that correct?

A. It's a consideration but, no, conviction does not matter.

Q. Okay.

A. Merely arrest.

Id. at 99:3 to 100:2.

There were nine points attributed to plaintiffs' home for "unknown" categories, and two points attributed to persons who did not reside at plaintiffs' residence being in possession of firearms – based upon the flawed analysis of Officer Lowen's Report as described throughout plaintiffs' complaint – relied upon by Lt Bills without any investigation:

Q. Now, on section VIII -- do you see that?

A. I do.

Q. It says: List any rifles, handguns, explosives, known or suspected to be in possession of suspect or associates likely to be present at location. And it says: Kneece, which is KN-E-E-C-E, and Jurrens, which is J-U-R-R-E-N-S, have both recently possessed handguns. And you apply or Mr. -- Officer Kidd applied a 2 numeric value to that on the matrix. Do you see that?

A. I do.

Q. And did you, in evaluating this matrix, determine whether or not Mr. Kneece or Mr. Jurrens had ever been at this location?

PAGE 13 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

>     A. I reviewed a report that had been done regarding that location and the possibility of a firearm having been deployed there.
>
>     Q. Okay. And this is the firearm deployment that was investigated by Officer Lowen?
>
>     A. I'd have to review but I believe that is correct.

Id. at 100:3-24. This same analysis was relied upon by Lt Bills when evaluating whether or not there was drug activity at plaintiffs' home. Michaels Decl. Ex. 1 (Bills Depo.) at 107:14 to 108:9.

In total, of the 27 points attributed on the matrix to plaintiffs' home, 19 points were: 8 for an arrest misdemeanor possession of a knife, 9 for "unknowns," and 2 for the flawed association of a gunshot at the home. As commander of SWAT, Lt Bills accepted these analyses. Her choice to do so put her in constructive notice that she would be held accountable for these decisions in this lawsuit for excessive use of force by SWAT.

## VI. THE DECLARATION OF JOHN BROWN ADDS NOTHING TO DEFENDANTS' MOTION

John Brown states in his declaration:

> During the initial and subsequent conversations I specifically recall Ms Ernst asking "Who is sending you" and I recall telling Ms. Ernst that it was Lieutenant Jennifer Bills who sent me over and that Lieutenant Jennifer Bills was in charge of the group that came and served the warrant at their house. I told her that Lt Bills had asked me to do this as a favor to her, which I had agreed to do. This occurred in August 2009.

Brown Decl. at 2. Joann Ernst strongly rejects this statement, and states to the contrary: "Mr. Brown made some statement about how brutal the item [the metal rod the SWAT team had left behind] looked. There was no other conversation about anything else. Our relationship is not a friendly one prone to personal discussions. There was certainly no conversation about Lt Bills personally or as a SWAT member." Ernst Decl. Ms. Ernst also states:

PAGE 14 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

> Mr. Brown and I serve on the EWEB board together, and have for the last 3 ½ years. Mr. Brown does not like me or my politics, and his hatred has accelerated since the SWAT team attacked my house. He has tried to have me censured on the board and voted against allowing me to serve as principle liaison with any outside committees or organization.
>
> Mr. Brown has also said more than once that he served a number of years on the police commission and was personal friends with some of the SWAT team members. So it is not surprising to me that he has a strong bias in favor of SWAT and against me as he relates the series of events surrounding my return of the SWAT weapon left behind in my home.

Ernst Decl. at ¶¶ 2 and 3.

The relationship between Ernst and Brown – personally and professionally – undermines any notion that a meaningful conversation could have occurred between them. This is more sharply apparent considering the text, purposem and context of the alleged encounter – none of which involved providing Ms. Ernst with information about EPD's decision-making procedures.

Equally misplaced is defendants' suggestion that somehow this conversation, over the misplaced SWAT weapon, if initiated by Lt Bills, would somehow inform plaintiffs that Lt Bills was the final decision-maker regarding the investigation and deception the EPD employed to engage SWAT unnecessarily upon this home.

A plaintiff's testimony via declaration is generally sufficient to defeat summary judgment. Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840, 844 n.2 (9th Cir. 2004). See also Lolli v. County of Orange, 351 F.3d 410, 412 (9th Cir. 2003) ("unsurprising[]" that officers' version is very different from plaintiff's, in case involving alleged failure to give medications in jail); Palmer v. Pioneer Inn Associates, Ltd., 257 F.3d 999 (9th Cir. 2003) (overturning summary judgment for employer because plaintiff's own affidavit was enough to

present a *prima facie* case); Tortu v. Las Vegas Metropolitan Police Dept, 556 F.3d 1075 (9th Cir. 2009) (reversing JNOV where plaintiff's testicle was injured during scuffle with airport police, with no explanation except plaintiff's).

Brown's Declaration adds nothing to this motion for summary judgment save for some obfuscation and mudslinging. At the least, given that Joann Ernst's declaration directly contradicts John Brown's declaration, his declaration cannot comprise a material fact allowing for summary judgment.

## VII. THERE WAS NO IMPUTED KNOWLEDGE THROUGH ADA CHRIS PAROSA

The City attempts to draw this Court into discovery discussions between plaintiffs' counsel Brian Michaels and prosecuting attorney Chris Paroso during the underlying criminal proceedings wherein plaintiffs were defendants   Through these email discussions as presented Lt Bills asks this court to draw inferences in contrast to the genuine character of the discussions.

In her Memorandum, Lt Bills mischaracterizes both the events as described by ADA Parosa, as well as the email communications themselves. This is what she says in her Memorandum:

> **Duty to Inquire**
>
> The running of the statute of limitations is also triggered by "inquiry notice." Greene v. Legacy Emanuel Hospital, 335 Or. 115, 123, 60 P.3d 535 (2002). Inquiry notice is when the plaintiff has knowledge which should trigger a duty to pursue further inquiry, where the inquiry would disclose the existence of a necessary element. Id. Even if plaintiffs really "fail[ed] to understand after reading the search warrant why they used a military approach and entrance to her home," the knowledge that Lt Bills held more information about the decision to utilize the SWAT unit triggered a duty to pursue a further inquiry. **That duty was triggered no later than September 2009 when the Deputy District Attorney told Mr. Michaels that Lt Bills could provide the names of SWAT operators involved, operations plans and after action reports for both 1910 Empire Park and 1295 Buck.  See Parosa Decl. Ex. 1.**

PAGE 16 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

(Emphasis added)

Lt Bills asks this court to infer that ADA Parosa communicated to Mr. Michaels (as criminal defense counsel) that Michaels could go directly to Lt Bills and obtain this information. But in fact the email discussions reveal only that ADA Parosa requested the information from the City on <u>behalf</u> of Michaels, yet that information was never forthcoming. A recent email discussion with Mr. Parosa (April 25, 2012) on this topic confirms that fact:

> Brian:
>
> I am not sure what you are asking me. My declaration shows that I forwarded the response from Matt Lowen to you. My email was clearly a response to your email, which was forwarded to Matt Lowen. So, to the extent that I was asking for the operation plan for the SWAT action, it was on your behalf. I think that is pretty clear.
>
> Chris

Michaels Decl. Ex. 6; <u>see id</u>. for complete discussion.

There was never any opportunity or suggestion that Mr. Michaels could or should go obtain the information on his own. On the contrary, attached to Mr. Parosa's Declaration is the following email on topic from Officer Lowen to ADA Parosa, in October 2009, cc'ing Lt Bills:

> From: LOWEN Matt R
> Sent: Wednesday, October 21, 2009 7:30 PM
> To: PAROSA Christopher J; KIDD Joseph A; BILLS Jennifer Y
> Subject RE: EPD Case No. -09-14500
>
> Chris,
>
> Lieutenant Jennifer Bills, the Eugene Police Special Operations Lieutenant is the only person that can authorize the release of that information. She has everything Mr. Michaels is requesting and I'm sure will have no problem releasing that to you for discovery. I'll allow the two of you to hash out the details.
>
> Thanks!
>
> Matt

PAGE 17 - PLAINTIFFS' RESPONSE TO BILLS' MOTION FOR SUMMARY JUDGMENT

Michaels Decl. Ex. 6.  This communication was for the purposes of allowing ADA Parosa (not Michaels) "to hash out the details" with Lt Bills.  Mr. Michaels was not mentioned as someone who was even allowed to participate or communicate in any fashion with the City.  These emails certainly do not allow for summary judgment in favor of defendant on the issue of when plaintiffs knew, or should have known, that Lt Bills was the final decision-maker for the City regarding the use of SWAT at plaintiffs' home.

**CONCLUSION**

Based upon the foregoing memorandum in support of plaintiffs' Response to Lt Bills' Motion for Summary Judgment, there are sufficient clearly material issues of fact, precluding summary judgment in favor of Lt Bills.

Respectfully submitted April 30, 2012.  [corrected May 15, 2012 to add header]

   /s/  Brian Michaels
Brian Michaels, OSB 925607

   /s/  Marianne Dugan
Marianne Dugan, OSB 93256
       Attorneys for Plaintiffs