UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

JOANN ALLEN ERNST, JAMIE            Case No. 6:10-cv-6245-AA
ALLEN, JOANNA ALLEN,
                                    OPINION AND ORDER
          Plaintiffs,

     v.

CITY OF EUGENE, a MUNICIPALITY;
Officer JOE KIDD, Officer MATT
LOWEN, Commander JENNIFER BILLS,
in their individual capacity,
and as a police official for
the City of Eugene,

          Defendants.

_____

AIKEN, Chief Judge:

     Plaintiffs filed suit against the City of Eugene (the City)

and three law enforcement officers alleging excessive force claims

under 42 U.S.C. § 1983 and negligence and battery claims under

state law. Plaintiffs' claims arise from the forcible and

1    - OPINION AND ORDER

unannounced entry of their home during the execution of a search warrant. Plaintiffs seek economic, non-economic, and punitive damages as well as costs and attorney fees.

Defendants move for summary judgment on all claims. On July 9, 2012, the court heard oral argument and allowed supplemental briefing on the reasonableness of the force used to execute the warrant. After review of the argument and briefing, defendants' motions are granted with respect to plaintiffs' claims against Officer Kidd and the City and denied in all other respects.

<u>BACKGROUND</u>

At the time of the events in question, plaintiff Joann Allen Ernst resided with her two adult daughters, plaintiffs Jamie Allen and Joanna Allen, at 1295 Buck Street in Eugene, Oregon. Joann Allen Ernst's adult son, Jack Allen, also lived at this address.

During the spring and summer of 2009, Eugene Police Department (EPD) Officers Joe Kidd and Matt Lowen were investigating heroin trafficking in the Eugene area. In May of 2009, a confidential informant (CI) identified Rodney Brandon Kneece, Jack Allen, and Brian Jurrens as individuals involved in the distribution of heroin. According to the CI, Kneece would purchase large quantities of heroin in Portland, Oregon and transport the drugs to Eugene with the help of his girlfriend. The CI also stated that Jack Allen would deliver smaller amounts of heroin to buyers after Kneece coordinated the sales. Kidd Decl. Ex. 7 at 5 (doc. 82).

In late June 2009, Officer Kidd was dispatched to a dispute in West Eugene. Officer Kidd made contact with Kneece and his girlfriend, who admitted they had been arguing. After Officer Kidd obtained consent to search Kneece's pockets, he discovered cash and an ID card belonging to Brian Jurrens. Kneece informed Officer Kidd that he had been at Jack Allen's house prior to the dispute with his girlfriend, and that he (Kneece) and his girlfriend lived at 1910 Empire Park Boulevard. Kidd Decl. Ex. 7 at 6.

In early July 2009, Officer Kidd responded to a call regarding an injured person in West Eugene. Officer Kidd again made contact with Kneece, who evidently had been involved in an altercation. Officer Kidd obtained consent to search Kneece's person and found cash and a cell phone containing text messages consistent with the sale and purchase of drugs. Kidd Decl. Ex. 7 at 6-7.

On July 11, 2009, Officer Lowen questioned Kneece and Jurrens at a local hospital after receiving a report of a gunshot wound. Lowen Decl. Ex. 20 (doc. 92). Jurrens had a gunshot wound on his hand and told Officer Lowen that he was shot while adjusting a passenger-side seat in a vehicle. However, Kneece stated that Jurrens told him that he was shot accidentally by Jack Allen while at Allen's house at 1295 Buck Street. Officer Lowen disbelieved both of Jurrens's explanations and instead found the wound "consistent with an accidental, self-inflicted gunshot wound." Lowen Decl. Ex. 20 at 8.

3    - OPINION AND ORDER

On August 6, 2009, Officer Lowen and Detective Sieczkowski of the Lane County Interagency Narcotics Enforcement Team contacted Kneece at 1910 Empire Park Boulevard. Kneece told the officers that he still lived there in a motor home and that Jurrens was inside a commercial building on the same property. Kneece also indicated that Jack Allen still lived at 1295 Buck Street and still sold heroin. Kidd Decl. Ex. 7 at 10.

On August 7, 2009 Officer Kidd submitted an affidavit in support of search warrants for 1910 Empire Park Boulevard and 1295 Buck Street. Officer Kidd's affidavit recounted his contacts with Kneece and included the information obtained from the CI and Kneece that Jack Allen was involved with the delivery of heroin. The affidavit also mentioned that Kneece reportedly had asked a friend to help him purchase a semi-automatic rifle in April of 2009. Kidd Decl. Ex. 7 at 10.

Officer Kidd requested authorization for twenty-four hour service of the warrants based on the following information:

> I am aware that Rodney Brandon Kneece was convicted in 2005 for Aggravated Assault, was arrested earlier this year for Unlawful Discharge of a Firearm and was reported four months ago to be in the possession of an Olympic Arms K-30 semiautomatic rifle. I am aware that Brian Jurrens recently received a gunshot wound in one hand in an incident that, according to Kneece, involved Jack Allen at 1295 Buck St. I am aware that Brian Jurrens is on post-prison supervision for Robbery III and Elude by Vehicle. I am aware that Jack Allen was arrested earlier this year for interfering with a Police Officer and was arrested in 2007 and 2008 for Carrying a Concealed Weapon. I am aware that Rodney Brandon Kneece, Brian Jurrens, Jack Allen and [Kneece's girlfriend] have all

been arrested for Delivery and/or Possession of Heroin in
recent years. Due to the potential of them being armed
with firearms, coupled with their illegal drug usage and
dealing, I am requesting twenty-four hour service for
this warrant.

Kidd Decl. Ex. 7 at 12-13. Omitted from the affidavit was Officer
Lowen's conclusion that Jurrens's gunshot wound was accidentally
self-inflicted, and that Jack Allen was not considered a suspect in
the shooting. See Lowen Decl. Ex. 20 at 4-8.

On August 7, 2009, a state court judge authorized the warrants
"to be executed any time of the day or night." Kidd Decl. Ex. 8 at
2. The warrant did not authorize a particular type of entry or
level of force to effectuate the search.

Under EPD General Order 1201.5, a search warrant affiant must
complete a Planned Operations Risk Matrix (Risk Matrix) and assign
numerical values to risks believed to be either present or unknown
at the location of the search. Bills Decl. at 3 (doc. 129).

The Risk Matrix for 1295 Buck Street identified risks
associated with Jack Allen's 2007 and 2008 arrests for carrying a
concealed weapon (a knife), Allen's absconded status as a parolee,
his alleged sale of drugs, and Jurrens's and Kneece's potential
possession of firearms. Kidd Decl. Ex. 6 at 1 (doc. 89, under
seal). The Risk Matrix totaled a number that "normally" indicates
activation of the EPD Special Weapons and Tactics (SWAT) unit and
requires consultation with a SWAT Commander. Kidd Decl. Ex. 6 at 2
(under seal).

Lieutenant Jennifer Bills, Commander of the SWAT unit, decided to utilize SWAT officers to serve the warrants at 1910 Empire Park Boulevard and 1295 Buck Street. Bill Decl. at 4 (doc. 129). Lt. Bills assigned scouts to observe 1295 Buck Street and report the presence of children, dogs, or obstacles to the house. Bills Decl. at 5 (doc. 129). She also directed the officers to draft a preliminary Operations Plan for execution of the search warrants.

Lt. Bills ultimately approved an Operations Plan for 1295 Buck Street that included the technique known as "breach and hold, where officers "breach" (i.e., break in) certain doors and windows of the building to be searched and control those areas from the exterior. Bills Decl. at 6 (doc. 129). The Operations Plan also called for the use of flash-bang devices and an armored vehicle, known as a "bearcat," stationed in the front yard of the house. Lowen Decl. Ex. 13 at 43-44 (doc. 90, under seal); Bills Decl. at 3-4 (doc. 80). Although Lt. Bills approved the Operations Plan, Officer Lowen drafted it.

On August 11, 2009 at around 5:45 a.m., officers convened at 1295 Buck Street to execute the search warrant, approximately thirty minutes after execution of the warrant at 1910 Empire Park Boulevard. The entry team at 1295 Buck Street consisted of Officer Lowen and five other law enforcement officers. According to the Operations Plan, an additional fourteen officers were stationed at the sides of the house and at nearby locations. Lowen Decl. Ex. 13

at 51-53 (under seal). Officer Kidd was not present at 1295 Buck Street; he was involved with the search at 1910 Empire Park Boulevard and remained there to coordinate the search.

Officers did not announce their presence prior to entering plaintiffs' home. Instead, Officer Kyle Evans broke open the front door while Officer Lowen broke and cleared a large front window in the living room area. Officer Marcus Pope then "visually cleared" the area and tossed a flash-bang device into the front entryway.[1] Pope Decl. at 2. Jamie Allen and Joanna Allen testified that they heard several "big huge booms" that "shook the whole house," apparently from the implement used to break open the front door. Jamie Allen Dep. at 29:22-24 (Nov. 4, 2011) (Miller Decl. Ex. 2) (doc. 78); see also Joanna Allen Dep. at 43:12-16 (Sept. 27, 2011) (Miller Decl. Ex. 3) (doc. 78); Jamie Allen Decl. at 1.

At about the same time, an officer stationed at the side of the house threw a second flash-bang device into the backyard, and

---

[1] A flash-bang device "is a light/sound diversionary device designed to emit a brilliant light and loud noise upon detonation. Its purpose is to stun, disorient, and temporarily blind its targets, creating a window of time in which police officers can safely enter and secure a potentially dangerous area." Boyd v. Benton Cnty., 374 F.3d 773, 776 (9th Cir. 2004).

Flash-bang devices generally ignite when emitting the bright light and loud noise and can cause property damage as well as bodily harm. Id.; see also United States v. Ankeny, 502 F.3d 829 833 (9th Cir. 2007) (two flash-bang devices thrown into a home caused first- and second-degrees burns to the defendant and started a mattress fire); Pope Decl. at 2 (indicating that a flash-bang device singed the carpet in plaintiffs' home).

7    - OPINION AND ORDER

two other officers broke and cleared windows to two bedrooms, shattering the glass. Based on photographs provided by defendants, glass shards landed on beds located directly beneath the windows, beds that were occupied at the time by Jamie Allen and Jack Allen. Lowen Decl. Exs. 18-19.

Plaintiffs also contend that a flash-bang device was thrown into Jamie Allen's bedroom, where she, her sister Joanna and a friend were sleeping. In addition to loud "booms," Jamie Allen testified that she awoke to "a huge blast and blast of light" and "glass shattering all over the house" and "all over" her face. Jamie Allen Dep. at 29:19-25. She further testified that something hit her head after her bedroom window was broken, and that officers later retrieved an item from her bedroom. Jamie Allen Dep. at 26:15-17, 38:15-17. Joanna Allen testified that she was asleep in a chair in Jamie's bedroom, and that she also awoke to the sound of breaking glass. Joanna Allen then saw a "huge flash of light" approximately one foot from her face and heard a loud boom, causing her ears to ring so badly she screamed in pain and could not understand an officer's command to turn on the lights. Joanna Allen Dep. at 39:25, 42:25-43:22; Joanna Allen Decl. at 1-2. The lights would not turn on, and Joanna Allen was told to open the bedroom door. When she did, "there was so much smoke" that she could not "see anything." Joanna Allen Dep. at 44:8-9.

After the house was "breached," officers entered and

handcuffed Jamie Allen and Joanna Allen and apprehended Jack Allen after he fled to the backyard. According to Jamie Allen and Joanna Allen, officers shouted and pointed assault weapons at them and made them walk barefoot on broken glass. See Jamie Allen Decl. at 2; Joanna Allen Decl. at 2. Joann Allen Ernst had been sleeping in a guest building in the backyard, and she was handcuffed after she emerged from the building. Joann Allen Ernst stated that smoke and broken glass were "everywhere." Ernst Decl. at 2 (doc. 112).

During the search of the home, officers discovered marijuana plants in the garage. Plaintiffs and Jack Allen were placed under arrest on marijuana charges, and Jack Allen was also arrested on several outstanding arrest warrants. Jack Allen and Joann Allen Ernst were transported to the Lane County Jail, and Jamie Allen and Joanna Allen remained handcuffed in the living room for several hours while detectives completed their search.

Plaintiffs were charged with possession and manufacture of marijuana. Ultimately, Jamie Allen and Joanna Allen pled guilty to misdemeanor offenses of Frequenting a Place where Controlled Substances are Used, and Joann Allen Ernst pled guilty to a misdemeanor offense of Unlawful Possession of Marijuana.

On August 11, 2010, plaintiffs filed this action and alleged claims of excessive force under § 1983 against the City and Officers Kidd and Lowen. Plaintiffs also alleged that Officers Kidd and Lowen engaged in judicial deception by omitting critical facts

from the affidavit in support of search warrant in order to obtain twenty-four hour service of the warrants. I granted defendants' motion for summary judgment on the judicial deception claim, as it necessarily implicated the validity of the search warrants and resulting misdemeanor convictions. Heck v. Humphrey, 512 U.S. 477, 485-87 (1994); Szajer v. City of Los Angeles, 632 F.3d 607, 611-12 (9th Cir. 2011).

On March 11, 2012, after obtaining leave of court, plaintiffs amended their complaint to add a claim against Lt. Bills. Plaintiffs allege that Lt. Bills approved the use of unreasonable and excessive force to execute the search warrant at 1295 Buck Street and therefore may be held liable under § 1983.

<u>STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party has the burden of establishing the absence of

genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. <u>Id.</u> at 324. Further, special rules of construction apply to summary judgment motions: 1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and 2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.

<u>DISCUSSION</u>

The gravamen of plaintiffs' excessive force claims is that the unannounced and forcible entry of their home by the SWAT unit in "paramilitary" fashion constituted an unreasonable and unjustified use of force. Plaintiffs maintain that Officers Kidd and Lowen used deception to gain authorization for deployment of the SWAT unit, and that Lt. Bills authorized the Operations Plan and the use of excessive force without justification. Plaintiffs also contend that the City bears municipal liability for its custom or policy of using excessive force to execute search warrants, or alternatively, for the decision of Lt. Bills as a policy-maker.[2]

---

[2]Plaintiffs expressly conceded their battery claim. However, plaintiffs did not respond to defendants' arguments regarding their negligence claim, and it is unclear whether plaintiffs intended to concede that claim. Given the lack of response, I grant summary judgment with leave to reconsider.

"Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under the circumstances." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). "Determining whether a particular use of force is reasonable requires a fact-finder to balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Boyd v. Benton Cnty., 374 F.3d 773, 778-79 (9th Cir. 2004) (quoting Graham, 490 U.S. at 396).

Specifically, "[t]he force which was applied must be balanced against the *need* for that force: it is the need for force which is at the heart of the *Graham* factors." Liston v. Cnty. of Riverside, 120 F.3d 965, 976 (9th Cir. 1997) (quoting Alexander v. City & Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994)); see also Tekle v. United States, 511 F.3d 839, 845 (9th Cir. 2007) ("[W]e must balance the force used against the need, to determine whether the force used was greater than is reasonable under the circumstances.") (internal quotation marks and citation omitted). Importantly, the balance of interests "must be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Boyd, 374 F.3d at 779 (quoting Graham, 490 U.S. at 396). At the same time, "[t]he need for such balancing" means that summary judgment "in excessive force cases should be granted sparingly." Id. (citation omitted).

With these principles in mind, I consider plaintiffs' § 1983 claim against each defendant.

A. Lieutenant Jennifer Bills

1. Statute of Limitations

Lt. Bills renews her argument that plaintiffs' § 1983 claim against her is barred by the relevant two-year statute of limitations. Douglas v. Noelle, 567 F.3d 1103, 1109 (9th Cir. 2009). In my earlier ruling, I found that plaintiffs did not discover Lt. Bills's role in approving the level of force until December 3, 2010, when defendants answered interrogatories and indicated that she had approved the Plan of Operations. Op. & Order at 3-4 (Feb. 17, 2012) (doc. 105). I further found no evidence suggesting that Lt. Bills's identity and role was "so obvious" as to be "inherently discoverable." Op. & Order at 4.

Lt. Bills contends that undisputed evidence establishes plaintiffs' actual and imputed knowledge of her involvement as of October 2009. Lt. Bills maintains that shortly after the search, a person named John Brown told Joann Allen Ernst that Lt. Bills was "in charge of the group" that served the search warrant. Brown Decl. at 2. Shortly afterward, Joann Allen Ernst apparently read an August 14, 2009 newspaper article identifying Lt. Bills as the SWAT Commander and recounting her explanation for the force used at 1295 Buck Street. Miller Decl. Ex. 2 at 7-9 (doc. 132); Ernst Dep. at 157:22-158:2 (Mar. 16, 2012) (Miller Decl. Ex. 2) (doc. 132). Lt.

13    - OPINION AND ORDER

Bills also asserts that in September and October 2009, a deputy district attorney told plaintiffs' counsel that Lt. Bills was the SWAT Commander and could provide the names of SWAT officers, the Operations Plan, and the after-action reports for both searches. Parosa Decl. & Ex. 1 at 1, 3. Lt. Bills argues that even if plaintiffs failed to understand the nature of her involvement, their knowledge that she possessed additional information triggered a duty to pursue a further inquiry.

I adhere to my earlier ruling. First, Joann Allen Ernst disputes that John Brown told her Lt. Bills was "in charge" of the SWAT unit. Ernst Decl. at 2-3 (doc. 141). Instead, she testified that Brown retrieved the rake used to break the front window and told her that SWAT officers would "harass her" if it was not returned. Ernst Dep. at 160:18-161:14. Second, the August 14, 2009 newspaper article did not indicate that Lt. Bills had approved the Operations Plan or was otherwise instrumental in the execution of the search warrant. Finally, though plaintiffs' counsel was told that Lt. Bills possessed certain information about the search, I do not find this evidence so unambiguous as to impute knowledge of her role in the search warrant execution. Accordingly, summary judgment is denied on this ground.

### 2. Reasonableness of Force

It is undisputed that Lt. Bills approved the deployment of SWAT officers to execute the search warrant and forcibly enter 1295

Buck Street, without announcing their presence, during the early morning hours. The parties dispute whether such force was reasonable under the particular circumstances.

"A nighttime incursion by a SWAT force is a far more serious occurrence than an ordinary daytime intrusion pursuant to a regular warrant and therefore requires higher justification beyond mere probable cause to search." Bravo v. City of Santa Maria, 665 F.3d 1076, 1085 (9th Cir. 2011). "Were this not the case, then any showing of probable cause to search would justify nighttime intrusion by a team of SWAT officers." Id. Similar to no-knock entries, nighttime SWAT searches must be justified by the presence of "exigent circumstances" where officers "'have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.'" Id. at 1085–86 (quoting Richards v. Wisconsin, 520 U.S. 385, 394 (1997)).

Accordingly, the court must examine the exigent circumstances asserted by defendants and determine whether the "need for force" justified the officers' use of force at 1295 Buck Street. Nelson v. City of Davis, 685 F.3d 867, 878 (9th Cir. 2012) ("[I]t is the need for force which is at the heart of the [analysis].") (citation omitted). Notably, the general likelihood that firearms or drugs would be present at 1295 Buck Street does not, standing alone,

warrant a finding of reasonableness as a matter of law. See Bravo,
665 F.3d at 1085 (citing and quoting with approval United States v.
Colonna, 360 F.3d at 1169, 1176 (10th Cir. 2004) ("[T]he mere
likelihood that drugs or weapons will be found at a particular
premises does not justify a no-knock or nighttime execution of a
search warrant.")); United States v. Bynum, 362 F.3d 574, 581 (9th
Cir. 2004) ("[T]he presence of a gun, standing alone, is
insufficient to justify noncompliance with the knock and announce
rule."). Rather, a particularized suspicion of danger or
destruction of evidence must support the need for force.

Lt. Bills argues that exigent circumstances justified her
approval of the Operations Plan for 1295 Buck Street. Specifically,
Lt. Bills maintains that the no-knock entry and "breach and hold"
technique were reasonable in light of the fact that Jack Allen and
Brian Jurrens, suspected heroin dealers with extensive criminal
histories, could be present at 1295 Buck Street and potentially
armed. See Bills Decl. at 4 (doc. 129); Bills Decl. at 2-4 (doc.
159). Given these circumstances, Lt. Bills asserts that "compliance
with a knock and announce requirement would [have] create[d] an
unreasonable risk to the entering officers' safety and [led] to the
destruction of evidence." Bills Decl. at 4 (doc. 159).

Lt. Bills emphasizes that officers had credible information
that Jurrens possessed a firearm and was associated with Jack Allen
and 1295 Buck Street. Lt. Bills also stresses the fact that the

semi-automatic rifle reportedly possessed by Kneece was not found at 1910 Empire Park Boulevard, leading officers to believe that the rifle might be located at 1295 Buck Street. Finally, Lt. Bills maintains that Jack Allen and Jurrens easily could have disposed of the suspected drugs if officers had announced their presence.

Plaintiffs portray a different version of the suspects and the facts underlying the asserted need for such force. Plaintiffs argue that the information known to officers depicted rather low-level offenders, particularly Jack Allen, whose criminal histories did not involve violent offenses, aggressive conduct or large quantities of drugs. Plaintiffs emphasize that Jack Allen's 2007 and 2008 misdemeanor arrests for a concealed weapon involved a pocketknife, and that he did not exhibit aggressive behavior toward police when apprehended on previous occasions. See Ernst Decl. at 3, 5 (doc. 165-2).[3]

With respect to the presence of firearms, plaintiffs highlight the fact that Officer Lowen believed that Jurrens shot himself accidentally, and that officers had no other basis to believe that Jack Allen possessed a firearm. Plaintiffs further contend that no credible evidence suggested that Jurrens lived or would be found at 1295 Buck Street, as evidenced by his omission in the Operations

---

[3]Jack Allen apparently was arrested for eluding an officer, and pepper spray was found after he was apprehended. Plaintiffs note that Allen made no attempt to use the pepper spray as he was detained. Ernst Decl. at 5 (doc. 165-2).

17    - OPINION AND ORDER

Plan. Plaintiffs also note that Kneece's possession of a semi-automatic rifle was not highlighted in Officer Kidd's affidavit or included in the Operations Plan for 1295 Buck Street, and it was given a lesser risk value than Allen's misdemeanor arrest. Kidd Decl. Ex. 6 (under seal); Lowen Decl. Ex. 13 at 54 (under seal).

Plaintiffs thus maintain that defendants exaggerate and misrepresent the extent of Jack Allen's criminal background, his alleged association with Jurrens, and the potential presence of firearms to create the impression that persons at 1295 Buck Street were armed and dangerous. Ernst Decl. at 3-6 (doc. 165-2).[4]

While I appreciate Lt. Bills's concerns regarding officer safety, I find that plaintiffs present sufficient evidence to raise questions of fact as to the reasonableness of the force used in this case. Although fairly extensive, Jack Allen's and Jurrens's criminal histories do not reflect a pattern of violence or hostility toward law enforcement officers, and the record contains no evidence that either suspect was considered violent. See Bynum, 362 F.3d at 580-81 (finding a "particularized fear of danger" to justify a forced entry where the defendant "had at least one readily accessible firearm" and previously had displayed firearms

_____

[4]Plaintiffs also request an "adverse inference" finding based on defendants' alleged destruction of a videotape of the "pre-raid" briefing. However, plaintiffs set forth no plausible evidence that a videotape existed or was destroyed by defendants or the EPD, and the City presents evidence that the "pre-raid" briefing was not videotaped. Froehlich Decl. at 2. Thus, I reject this request.

to police, including a "chambered semi-automatic pistol" while
"wearing only a pair of socks"; Colonna, 360 F.3d at 1176 (finding
a nighttime SWAT search reasonable where the suspect had been
aggressive toward officers and arrested for strong arm robbery,
aggravated assault, assault on a police officer, resisting arrest,
aggravated robbery with a firearm, and terroristic threats).

Further, although officers possessed credible evidence that
Jurrens had access to a firearm, the Operations Plan did not
reference Jurrens or indicate the potential presence of "unusual
weapons," such as Kneece's rifle, at 1295 Buck Street. Lowen Decl.
Ex. 13 at 40-41, 54 (under seal). Presumably, a semi-automatic
rifle with the capability of piercing exterior walls and bullet-
proof vests would be considered "unusual." Kidd Decl. at 2 (doc.
161); see United States v. Peterson, 353 F.3d 1045, 1049 (9th. Cir.
2003) (finding forcible entry justified where police had credible
information that the defendant's house contained explosives, and
the defendant had expressed a willingness "to blow some shit up .
. . at any time"). Thus, given plaintiffs' assertions and the
evidence presented, I cannot find as a matter of law that the
evidence reflects "the presence of a firearm coupled with evidence
that a suspect is willing and able to use the weapon" to justify
the force used at 1295 Buck Street. Bynum, 362 F.3d at 581-82.

For example, in United States v. Ankeny, 502 F.3d 829 (9th
Cir. 2007), the defendant sought to suppress evidence on grounds

that law enforcement officers used excessive force in executing a search warrant. Officers had entered a home with a battering ram, threw two flash-bang devices into the home, and shot out windows with rubber bullets. Id. at 833. The Ninth Circuit found it a "close question" whether such force was reasonable, even though the "[d]efendant had a substantial criminal record, which included violent crimes; there was reliable evidence that he was armed and aggressive; there were several other people in the house, including a former prison inmate; and certain physical characteristics of the house made it difficult to secure." Id. at 836. In particular, the court noted that the "record is unclear with respect to whether and why it was necessary to shoot out so many windows and break down so many doors," and whether "the officers took all appropriate and available measures to reduce the risk of injury here." Id. at 837.[5]

Likewise, it is not clear from this record "why it was necessary" to forcibly enter plaintiff's home without announcement, break bedroom windows, and throw flash-bang devices. Plaintiffs' allegations regarding flash-bang devices render summary judgment particularly inappropriate. Plaintiffs contend that a flash-bang

---

[5]The language in Ankeny is arguably dicta, as the court found the question of excessive force immaterial to the validity of the challenged search warrant for suppression purposes. Ankeny, 502 F.3d at 837. Regardless, the fact that the Ninth Circuit deemed the use of force "a close question" in such circumstances militates against summary judgment in defendants' favor here, where officers did not possess reliable information that Jack Allen and/or Jurrens were armed and aggressive.

device was thrown into Jamie Allen's bedroom, causing a bright light and loud boom a mere foot from Joanna Allen's face.[6] This disputed fact alone precludes summary judgment. See Boyd, 374 F.3d at 779 ("blindly" throwing a flash-bang device into any part of a residence is an unconstitutional use of excessive force); United States v. Jones, 214 F.3d 836, 837 (7th Cir. 2000) (stating that "police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash bang device'").

Aside from the flash-bang devices, officers broke large windows that were located above beds with sleeping occupants. Lt. Bills emphasizes that the bedroom windows were covered and states that she took "a calculated risk" to break the bedroom windows "so that the officers could rapidly control the majority of the house without physically entering it." Bills Decl. at 6 (doc. 159). However, the windows were not "papered over" or covered in a manner that suggested potential criminal activity; they were covered by curtains and possibly a blanket. Jamie Allen Dep. at 105:5-16 (Mar. 16, 2012) (Miller Decl. Ex. 2) (doc. 162); United States v. Combs,

---

[6]Defendants dispute that a flash-bang device was thrown into a bedroom but concede that the court must construe this disputed fact in plaintiffs' favor. Regardless, Jamie Allen testified that an officer retrieved an object from her room, and plaintiffs present evidence that officers used three flash-bang devices during the execution of the warrants. Jamie Allen Dep. at 26:15-17 (Nov. 4, 2011); Michaels Decl. Ex. 13 (doc. 118, under seal). Further, no officer remembers flash-bang devices at 1910 Empire Park Boulevard. Solesbee Dep. at 101:19-24, 103:12-104:8 (Dec. 16, 2011) (Michaels Decl. Ex. 4) (doc. 142, under seal).

394 F.3d 739, 745 (9th Cir. 2005) (finding a forcible entry reasonable where, among other exigent circumstances, the "[w]indows were papered over, suggesting that the occupants of the home were concerned with protecting their illegal methamphetamine laboratory").

Finally, reasonable minds could differ as to whether "the officers took all appropriate and available measures to reduce the risk of injury here." Ankeny, 502 F.3d at 837. Plaintiffs argue that Lt. Bills made no attempt to arrest Jack Allen on outstanding warrants or otherwise investigate other feasible alternatives to the "breach and hold" entry of their home. Plaintiffs maintain that Lt. Bills's failure to do so was unreasonable, particularly when officers knew non-suspects resided at 1295 Buck Street, including Jack Allen's sister and possibly children. See, e.g., Kidd Decl. Ex. 6 at 2 (under seal).  As noted by the Supreme Court:

> [W]hile drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree. For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence.

Richards, 520 U.S. at 393.

Lt. Bills states that she chose the "breach and hold" tactic of entry at 1295 Buck Street over other tactics because it provided for greater officer safety. Bills Decl. at 4-6 (doc. 159). Lt. Bills further explains that she considered arresting Jack Allen and

22   - OPINION AND ORDER

Jurrens "offsite" before executing the warrant at 1295 Buck Street, but she decided against this tactic because Jurrens and Allen could flee or destroy evidence if they learned of Kneece's arrest at 1910 Empire Park Boulevard. Bills Decl. at 5 (doc. 159).  However, the evidence does not reflect whether Lt. Bills considered either arresting Jack Allen and Jurrens <u>before</u> the search of 1910 Empire Park Boulevard or serving the search warrant at 1295 Buck Street when Jack Allen and/or Jurrens would not be present. Regardless, the feasibility of options under the specific circumstances is a question for the jury, not this court.

"Because [the excessive force] inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." <u>Glenn v. Washington Cnty.</u>, 673 F.3d 864, 871 (9th Cir. 2011) (quotation marks and citation omitted); <u>see also</u> <u>Liston</u>, 120 F.3d at 976, n.10 ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.") (citing cases). This principle is particularly true in this case. Construing all facts and inferences in favor of plaintiffs, a reasonable jury arguably could find that the force used to execute the search warrant at 1295 Buck Street was not justified, and that other, less intrusive means of entry were feasible. <u>Bravo</u>, 665 F.3d at 1085-86; <u>Ankeny</u>, 502 F.3d at 836-37.

This is not to say that I find plaintiffs' version of facts accurate or discount potential dangers faced by officers when executing search warrants. Rather, the record simply does not lend itself to a finding that, as a matter of law, the force used to execute the search warrant was reasonable.

3. Qualified Immunity

Alternatively, Lt. Bills argues that she is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To ascertain whether qualified immunity applies, the court determines whether a deprivation of a constitutional right occurred and whether that right was clearly established at the time of the deprivation, though not necessarily in that order. Id. at 232-36; Nelson, 685 F.3d at 875.

> Under the current approach, a district court should decide the issue of qualified immunity as a matter of law when the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts. Only where historical facts material to the qualified immunity determination are in dispute should the district court submit the issue to a jury.

Conner v. Heiman, 672 F.3d 1126, 1131 (9th Cir. 2012) (internal quotation marks and citations omitted). Here, I find disputed

24   - OPINION AND ORDER

issues of material fact that preclude the application of qualified
immunity at this stage of the proceedings.

First, questions of fact remain as to whether a constitutional
violation - the use of excessive force - occurred. Second, given
the questions of fact, I cannot determine whether a reasonable
officer would have believed that the force used to execute the
search warrant at 1295 Buck Street was lawful.

In particular, plaintiffs dispute whether defendants actually
believed that Jurrens or a semi-automatic weapon would be located
at 1295 Buck Street, relying in part on the omission of both in the
Operations Plan. Plaintiffs also dispute whether defendants had
knowledge, at the time of the search, of additional facts asserted
in their supplemental declarations, given that such facts were not
recited in the affidavit in support of search warrant. Pls.'s
Response to Suppl. Mem. at 6-8 (doc. 165). Depending on the facts
actually known or believed by defendants, plaintiffs dispute the
asserted need for a forced entry or flash-bang devices and contend
that officers could have executed the warrant in a less intrusive
and destructive manner.

Questions of fact also exist as to whether a flash-bang device
was thrown into Jamie Allen's bedroom and, if so, whether Lt. Bills
knew of or authorized this action. Lt. Bills contends that even if
a flash-bang device was thrown into a bedroom, such force was
unauthorized and she was unaware of it. Bills Decl. at 7 (doc.

129). However, I find that Lt. Bills's knowledge is a question of fact for the jury.

Given these questions of fact, I cannot find as a matter of law that the application of qualified immunity is appropriate. Accordingly, Lt. Bills's motion for summary judgment is denied.

B. Officer Matt Lowen

Officer Lowen moves for summary judgment on grounds that he did not violate plaintiffs' constitutional rights by breaking their front window, because such property damage was necessary for the effective execution of the search warrant. See Liston, 120 F.3d at 979. However, as explained above, questions of fact remain as to the reasonableness of the force used.

Officer Lowen also contends that summary judgment is warranted because he was unaware of any unauthorized use of a flash-bang device in Jamie Allen's bedroom. Granted, Officer Lowen was not stationed near the bedroom windows, and the Ninth Circuit has held that "integral participation" in the alleged unconstitutional action is required as a "predicate to liability." Boyd, 374 F.3d at 780. However, it remains a question of fact whether a flash-bang device was thrown into Jamie Allen's bedroom and whether and to what extent Officer Lowen knew of other officers' actions. This is not to say that I find Officer Lowen less than credible, only that the court may not assess credibility on summary judgment. Nelson v. City of Davis, 571 F.3d 924, 927 (9th Cir. 2009).

Moreover, even if officers did not throw a flash-bang device into a bedroom, questions of fact exist regarding the reasonableness of the no-knock entry, the "breach" of the front door and three windows, and the use of flash-bang devices in the entryway and backyard. Officer Lowen drafted the Operations Plan for the search warrant, broke the large front window with a "rake," and was present when Officer Pope tossed a flash-bang device in the front entryway. Lowen Decl. at 3, 4, 6. Thus, at a minimum, plaintiffs raise genuine issues of fact as to whether Officer Lowen was an "integral participant" in the execution of the search warrant. Boyd, 374 F.3d at 780.[7]

Additionally, as explained with respect to Lt. Bills, questions of fact preclude Officer Lowen's reliance on qualified immunity at the summary judgment stage. Accordingly, Officer Lowen's motion for summary judgment is denied.

C. Officer Joe Kidd

Officer Kidd moves for summary judgment on grounds that he was not present during the execution of the search warrant at 1295 Buck

---

[7]Admittedly, plaintiffs have offered shifting theories to support Officer Lowen's liability, stating at one point that he was being sued based on his "involvement in obtaining the use of SWAT for execution of the search warrant at plaintiffs' home in the pre-dawn hours." Pls.'s Mem. in Opp'n at 2 (doc. 116, under seal). However, Officer Lowen's "involvement" necessarily implicates his preparation of the Operations Plan, which in turn called for his participation in executing the search warrant. Further, as indicated at oral argument, plaintiffs generally challenge the force used at 1295 Buck Street.

Street and was not involved in drafting the Operations Plan. Plaintiffs do not dispute these facts, and, as stated above, "integral participation" in the alleged unconstitutional action is a "predicate to liability." Boyd, 374 F.3d at 780. Officer Kidd could not have been an "integral participant" of the search warrant execution if he neither planned nor participated in it. See Hopkins v. Bonvicino, 573 F.3d 752, 770 (9th Cir. 2009).

Plaintiffs nonetheless argue that Officer Kidd may be liable for the use of excessive force, because his misleading and inaccurate statements regarding Jack Allen's criminal history and Allen's alleged involvement in Jurrens's gunshot wound led to the deployment of the SWAT unit. Even if plaintiffs' allegations supported a viable cause of action, plaintiffs present no evidence that Lt. Bills was deceived or misled by Officer Kidd's statements when she approved the Operations Plan and the "breach and hold" technique. See Bills Decl. at 5 (doc. 129).

Given Officer Kidd's undisputed lack of involvement, plaintiffs fail to present evidence supporting an inference that Officer Kidd was an "integral participant" in the alleged use of excessive force at 1295 Buck Street. Accordingly, summary judgment is granted in Officer Kidd's favor.

D. City of Eugene

Plaintiffs also allege a § 1983 municipal liability claim against the City. See Monell v. Dep't of Soc. Servs., 436 U.S. 658,

690-91 (1978). Plaintiffs maintain that the City employs a de facto policy, practice, or custom approving the use of excessive force in similar cases; that the City's faulty Risk Matrix led to the level of force used in this case; and that the City fails to train its officers adequately in the use of force during execution of search warrants. Alternatively, plaintiffs allege that the City is liable for the decision of Lt. Bills as a final policy-maker for the City. As defendants note, plaintiffs' *Monell* claim is problematic for several reasons.

First, plaintiffs present no evidence that the City has a de facto practice, policy, or custom of using excessive force indiscriminately when executing search warrants. To the contrary, the evidence submitted reflects that law enforcement officers determine the manner of execution based on the relevant risks and circumstances in each case. Bills Decl. at 3-4 (doc. 129).

Second, plaintiffs fail to establish that the Risk Matrix is a policy that led to the use of excessive force in this case. The Risk Matrix is a tool used by officers to assess potential risks in executing a search warrant and the potential involvement of the SWAT unit. The Risk Matrix itself does not dictate a specific technique or use of force in executing a search warrant, and it is but one of many factors taken into consideration. Bills Decl. at 3 (doc. 129); Bills Dep. at 85:3-20 (Oct. 18, 2011) (Michaels Decl. Ex. 18) (doc. 118, under seal). Even if the Risk Matrix could be

29   - OPINION AND ORDER

considered a "policy," it was not the "moving force" behind plaintiffs' alleged constitutional violation, as the Risk Matrix for 1295 Buck Street did not dictate or authorize a specific type of entry or level of force. <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011) (municipal policy must be "moving force" behind constitutional deprivation). At most, the Risk Matrix indicated, though did not require, activation of the SWAT unit to execute the warrant at 1295 Buck Street. However, the alleged constitutional deprivation was not caused by the mere presence of the SWAT unit but rather by the force used by the SWAT unit.

Further, plaintiffs present no tangible evidence that the City failed to train its officers in the use of force and flash-bang devices. The only arguably viable aspect of this claim is the allegation that officers blindly threw a flash-bang device into a bedroom with sleeping occupants. However, plaintiffs present no evidence to support the theory that officers did so based on the lack of training as opposed to some other factor.

Finally, plaintiffs attempt to paint Lt. Bills as a final policy-maker in order to extend <i>Monell</i> liability to her singular decision to utilize the "breach and hold" technique. However, plaintiffs present no evidence or authority to support their theory that a police lieutenant possesses final policy-making authority for the City of Eugene. <u>See</u> Defs.'s Reply at 17-18 (doc. 124). Accordingly, summary judgment is granted in favor of the City.

30    - OPINION AND ORDER

CONCLUSION

The City of Eugene, Officer Kidd, and Officer Lowen's motion for summary judgment (doc. 76) IS GRANTED as to plaintiffs' § 1983 claims against Officer Kidd and the City of Eugene and their state law claims. The motion is DENIED as to plaintiffs' § 1983 claim against Officer Lowen. Lt. Bills' Motion for Summary Judgment (doc. 127) is DENIED. Plaintiffs' Motion to Strike (doc. 109) is DENIED as unnecessary.

The court strongly encourages the parties to contact Magistrate Judge Coffin's chambers to discuss and schedule mediation efforts.

IT IS SO ORDERED.

DATED this 16 day of October, 2012.

_____
Ann Aiken
United States District Judge